UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA A. SHAW (MOTHER) o/b/o
KETRAVION EDWARDS, A MINOR

                Plaintiff,                Case No. 05-70087

vs.

                                        HONORABLE AVERN COHN

JO ANNE B. BARNHART,                HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION

## I.      Background

Plaintiff brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner regarding his application for Child's Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Defendant's motion be GRANTED and Plaintiff's motion be DENIED.

### A.      Procedural History

Ketravion applied for SSI on September 19, 2002, alleging that he had became disabled on June 15, 1996, due to complications arising from the fact that he was born with his right leg longer than his left (R. 40-49). Ketravion's application was denied following a hearing before Administrative Law Judge Michael F. Wilenkin (ALJ) (R. 13-21). The Appeals Council denied Ketravion's request for review (R. 5-8).

B.    **Background Facts**

1.    ***Medical Evidence***

Ketravion was born with his right leg shorter than his left (R. 72).[1]  On April 7, 1997, his orthopaedic surgeon, Deborah F. Staniski, M.D., noted that the majority of the shortening was below his right knee, however his right thigh was also shorter than his left.  His right ankle had good range of motion but his right knee had a mild valgus position when extended.  He had anteroposterior instability of the right knee.  Dr. Staniski's plan was to follow Ketravion clinically and radiographically every six months to determine at what point he should undergo his first leg lengthening procedure, as she had determined that it would be necessary to lengthen the tibia and the fibula, stabilize the foot and ankle and straighten out the valgus deformity around his right knee.  Dr. Staniski explained that it would take a number of surgical procedures to equalize Ketravion's limbs (R. 78).

By April 23, 1997, when Ketravion was approximately 1-year-old, he was fitted with a fixed ankle right orthosis (AFO) and was ambulating independently (R. 73).  On October 22, 1997, Dr. Stanitski considered fitting Ketravion with a lift for his right shoe to compensate for the 2 centimeter limb length inequality she had measured at that time, but decided to see him back in six months to repeat a comprehensive visit first.

On February 17, 1999, Ketravion was reevaluated at the orthopaedic clinic by Kathryn E. Cramer, M.D. (R. 137).  Dr. Cramer noted that he now had a 3.5 centimeter limb length discrepency upon clinical examination, with a 2 centimeter discrepency shown on x-ray.  His physical examination was otherwise normal.  He had normal range of motion and strength and needed a shoe

---

[1]Ketravion was born on June 29, 1996 (R. 49).

lift, a new AFO and another visit in a year (R. 138).

On November 24, 1999, Ketravion was seen by Dr. Cramer (R. 136).  His AFO was adjusted and his ankle showed some signs of tightening, but dorsiflexion was still good at 20 degrees.  His limb length discrepancy had not changed much and Dr. Cramer recommended a one-year follow up.

On April 4, 2001, Ketravion was seen by Dr. Cramer (R. 135).  Ms. Shaw reported that he had met all of his milestones and that he ran and played.  His AFO had been destroyed.  Upon examination Dr. Cramer noted that Ketravion corrected with a 1 ½ inch block and had obvious femoral shortening in addition to tibial leg length discrepancy.  The right foot was one size smaller and had four toes.  His ankle could only be brought neutral and his heel cords were tight.  He was neurovascularly intact otherwise, and walked on his toes.  His discrepancy was now 4 centimeters.  His AFO was discontinued and he was given a larger shoe lift and a prescription for physical therapy.  Dr. Cramer asked Ms. Shaw to bring Ketravion back in three months, but she did not show for a July 18, 2001, appointment.

On September 5, 2001, when Dr. Cramer examined Ketravion Ms. Shaw reported that they had not been able to get into physical therapy, but that they did get the new shoe lift (R. 134).  Ketravion was running, playing and jumping normally.  Dr. Cramer and Ms. Shaw agreed that Ketravion's heel cord had loosened.  The physical therapy prescription was discontinued and Dr. Cramer asked that they continue the home program and return in April 2002.

On April 24, 2002, Dr. Cramer examined Ketravion, who was then 6-years old (R. 133).  Ms. Shaw and Dr. Cramer discussed limb lengthening surgery, to which Ms. Shaw agreed.

On May 15, 2002, Dr. Cramer examined Ketravion and met with Ms. Shaw and Ketravion's father to discuss preparations for surgery (R. 132).

Ketravion was evaluated for pre-surgery physical therapy on May 23, 2002 (R. 87-89). His mother described his limb length discrepancy as 2 inches (R. 87). Ms. Shaw explained that Ketravion walked with the use of a shoe lift, but that she has opted for the lengthening surgery. The physical therapy would be used to increase the range of motion in the ankle prior to surgery through serial casting. Ketravion's right ankle dorsiflexion was measured at +3 degrees with his knee flexed and 0 degrees with his knee extended. His gait with the shoe lift was described as "near normal", and it was noted that without the shoe lift he had to walk on his tip toes to equalize the limb length discrepancy (R. 88). Ketravion's balance and coordination were normal, and he could maintain a single leg stance for greater than fifteen seconds. Ketravion was casted to achieve +5 dorsiflexion with ankle and foot in subtalar neutral, and neutral mid and forefoot, and a two inch buildup to compensate for the limb length discrepancy. Ketravion was to be seen each week for 4 weeks, with a goal of increasing his range of motion in his right ankle to +15-20 degrees (R. 86).

On June 19, 2002, Dr. Cramer reported that Ketravion's heel cord responded well to physical therapy increasing his ankle dorsiflexion to 10 degrees of, but the AP instability in his knee remained unchanged (R. 131).

An operation to lengthen Ketravion's right leg was performed on an in-patient basis on June 24, 2002, and Ketravion was discharged on July 1, 2002 (R. 92-106). The operation consisted of making incisions in the right tibia, fibula and femur and applying an external fixation device (R. 92, 103-104). His discharge instructions limited him to weight bearing on his right leg as tolerated, with a follow-up appointment scheduled for July 3, 2002 (R. 93).

On July 3, 2002, Dr. Cramer saw Ketravion in the clinic postoperatively and noted that he was doing quite well at home (R. 130). He was ambulatory with his walker, doing much better with

pin care, and having no trouble with turns.  His active dorsiflexion markedly improved from his hospital stay, and he was weight bearing and was given a shoe with a 3.5 centimeter lift to wear under his foot and tied to the frame.  X-rays confirmed that he was lengthening.

On July 10, 2002, Ms. Shaw reported to Dr. Cramer that Ketravion's appetite was back to normal and still ambulatory with his walker (R. 129).

On July 17, 2002, Ms. Shaw reported to Dr. Cramer that Ketravion's personality had returned, with the exception of whining, which Dr. Cramer explained was typical behavior and understandable given the procedure that was done (R. 128).  He was using minimal pain medication and was attending his first physical therapy appointment on this day.  His was still not fully weight bearing.

Ketravion was evaluated for physical therapy and it was determined that he would be seen 2-3 times per week for 6-8 months (R. 122).  Treatment was to include strengthening, transfer training, gait training and a home exercise program (R. 115).  Ketravion was described as weight bearing as tolerated in the beginning of his therapy, as of July 17, 2002.  He required minimal assistance for transferring from a wheelchair to and from a mat and also from sitting to standing (R. 116).  He was able to stand for 1-2 minutes with 50-60% weight bearing on his right leg.  He complained of right knee tenderness and right foot pain in certain position changes.  During the course of his physical therapy he progressed to a point where his mother "had no new complaints" and he demonstrated improved weight bearing on his right leg.  It was recommended that he be moved from a walker to a cane by October 17, 2002 (R. 108).

On July 24, 2002, Dr. Cramer noted that Ketravion had lost 1/4 pound since his last visit, was able to place weight on his limb but was not fully weight bearing and continued to show progress

in lengthening (R. 127).

By July 31, 2002, Ketravion had lost one pound since his surgery (R. 126).  He was able to place weight on the right leg but was still not full weight bearing, and x-rays confirmed good bone formation.  As of this date all turns on the external fixator were stopped.

On August 21, 2002, Dr. Cramer noted that Ketravion had lost two pounds since his surgery, but Ms. Shaw explained that he had been eating better until they had to start his pain medicine again (R. 125).  His pins had caused him some irritation to his foot which caused him to bear less weight on his right leg.  Upon examination Dr. Cramer confirmed some "soupy pins".  He was given a prescription for an antibiotic and asked to increase pin care to 3 times per day and return in four weeks.

On September 18, 2002, Ketravion weight was up 1 pound from his last visit, but his physical therapist reported that he was not fully weight bearing (R. 124).  Upon examination the pins in his foot were still "soupy" and quite painful, so Dr. Cramer continued the antibiotic.  The frame was scheduled to be removed the following week.

On October 23, 2002, Ketravion was walking with a fitted attachment and without assistive devices (R. 123).  He still had a proximal pin site that was irritated, draining and had granulation tissue with radiolucency in the area.  Dr. Cramer recommended that he continue weight bearing and return in three weeks for pin removal.

On November 12, 2002, a Social Security Administration pediatrician, Sharda Sood, M.D. completed the *Childhood Disability Evaluation Form*, and checked the box indicating that Ketravion's "medically determinable impairment(s) was of listing level severity, but is not expected to be or was not, of listing level severity for 12 continuous months" (R. 66).  Dr. Sood went on to

conclude that Ketravion showed no limitation in "acquiring and using information"; no limitation in "attending and completing tasks; less than marked limitation in "interacting and relating with others"; less than marked limitation in "moving about and manipulating objects"; no limitation in caring for himself; and less than marked limitation in "health and physical well-being" (R. 68-70). In explanation of her findings Dr. Sood wrote that though Ketravion would be non-weight bearing during lengthening process, this was "not expected to last 12 months" (R. 69). She also indicated that though he would need an ambulatory aid during lengthening process, he was expected to ambulate without assistance in fewer than 12 months (R. 70).

On November 20, 2002, Ketravion was fully ambulatory and could stand on one leg (R. 151). Dr. Cramer reduced the eternal frame on this date by removing one of his pins and reducing the bars to three at his femur, three across the knee and three in his tibia.

On December 11, 2002, Ketravion's frame was further reduced and he was described as fully weight bearing and quite comfortable, and all of his pin sites were "okay" (R. 150). He still had bit of lateral defect on the femur and a medial defect on the tibia which concerned Dr. Cramer. She went down to two bars each on the lengthening sites. She recommended that he continue weight bearing as tolerated, continue physical therapy and have a hinge placed on his ankle brace.

On January 3, 2003, Dr. Cramer noted that Ketravion had been uncomfortable since she last reduced his frame, but that the lateral defect she had noted appeared to be filling in and the medial defect had much improved. She was concerned because the tibia was subluxed a bit anteriorly. She recommended the he return to physical therapy and continue weight bearing as tolerated.

On January 29, 2003, David A. Podeszwa, M.D., saw Ketravion for an orthopaedic follow up visit and noted no difficulties since his last visit (R. 148). Ketravion had continued physical

therapy and was doing quite well with gait.  He had some occasional complaints of pain which were relived with rest and occasional use of Motrin, otherwise he had been active.  His pin sites were "pristine" and his ankle dorsiflexion was 10-15 degrees.  He ambulated bearing full weight without assistive devices but with a noticeable limp.  X-rays still showed a lateral defect of the distal femur, but this had improved.  Dr. Podeszwa recommended continued physical therapy and weight bearing as tolerated, as well as placement of a bone simulator to help with consolidation.

On April 2, 2003, Dr. Podeszwa noted that Ketravion had not had any further difficulties and had been ambulating fully weight bearing (R. 147).  Upon examination there was no significant change from his last visit.  X-rays confirmed that there was no significant improvement in the healing of the regenerate bone.  Dr. Podeszwa consulted with his partners and they determined that it would be best to remove the frame and place Ketravion in a long leg cast to help change the "mechanics of the bone healing".

On April 30, 2003, Ketravion was seen for a follow up visit.  Ketravion had been walking with weight bearing in the long leg cast as tolerated.  He had not had any real difficulties, but the proximal part of the cast was soaked with urine.  The femur showed very small improvement in the healing of the regenerate site.  The cast was changed and Dr. Podeszwa recommended that Ketravion continue weight bearing as tolerated and return in four weeks.

On July 2, 2003, Ketravion's long leg cast was removed (R. 169).  Dr. Podeszwa noted that he had been ambulating full weight bearing and "probably doing more than we would have liked" since his last visit.  He had no range of motion in his knee, and had a slight valgus at the knee, with mild Achilles tightness and could only be brought to 5-10 degrees dorsiflexion.  Dr. Podeszwa prescribed physical therapy to restore range of motion to the knee, though he was skeptical that this

would work and assumed that a release and quadricepsplasty would be required.

Ketravion started physical therapy on July 16, 2003 (R. 188). He was to attend 2-3 times per week for 12 weeks with the goal of increasing his range of motion in his right knee. On July 24, 29 and 31 the therapist reported that Ketravion tolerated the treatment well, was gaining range of motion with the stretches becoming less painful (R. 192).

On July 28, 2003, Ketravion had a mental health intake assessment at Easter Seals Southeastern Michigan, by Christian McCallister (R. 163-67). McCallister interviewed Ms. Shaw who indicated that she wanted Ketravion to "come out of his shell" and respond when people talked to him (R. 163). She noted that he liked school and was good in math, liked video games, but talked about not being able to make it after his surgery. She explained that he did not like to do his physical therapy, it was painful and he tried to avoid it. His mood was better before the surgery. For instance he used to get along with his sister but they now argued daily. He was also having nightmares, cried whenever he went to the hospital, had a decreased appetite and talked about not wanting to be "here" right after his surgery. Ketravion indicated that he had friends (R. 164). McCallister observed Ketravion to be cooperative, soft spoken, unremarkable in motor activity, with a fair memory and normal perceptions and unremarkable thought process, normal mood, broad affect, fair judgement, fair impulse control and fair insight (R. 165). McCallister diagnosed Ketravion with Axis I -Primary - "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct"; Axis I - Secondary - Posttraumatic Stress Disorder; Axis I - Tertiary - Enuresis; Axis IV - problem with primary support group, problem related to social environment, other psychosocial and environmental problems and behavioral/personality issues (R. 166). He rated Ketravion's Axis V

Global Assessment of Functioning (GAF) at 55.[2]

On August 4, 7 and 12 the physical therapist reported that Ketravion tolerated the stretches but cried on one day and tolerated the stretches fairly on another (R. 193). Ketravion achieved 42 degrees of flexion in this time period. Ketravion achieved 50 degrees of flexion from August 14-21 with fair tolerance (R. 194).

On September 3, 2003, Dr. Podeszwa noted that physical therapy was able to achieve 30-40 degrees of flexion in Ketravion's knee, but had difficulty maintaining this motion (R. 168). An ultra flex dynamic splint had been ordered for his knee and was due to arrive within 2 weeks. Dr. Podeszwa was only able to achieve 10-20 degrees of flexion. X-rays showed healed regenerate sites. Dr. Podeszwa ordered continued physical therapy, and noted that surgical intervention would not be considered until non-operative measures had been exhausted.

In the period from September 11 through October 2, Ketravion achieved 40-42 degrees of flexion and fair tolerance of the stretches (R. 196). He missed physical therapy appointments scheduled for September 22, 24 and 29th.

On December 8, 2003, Ketravion had another psychiatric assessment at Easter Seals Southeastern Michigan, this time by Lalitha Vemuri M.D. (R. 198-99). Ms. Shaw reported that Ketravion was a happy child before his surgery but had since become moody, depressed and withdrawn from his peers and teachers (R. 198). She stated that in school he sometimes just sat and

_____

[2]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id*.

did not even do his work, though since Thanksgiving his teachers had apparently reported that his schoolwork had picked up to some extent.  His grades were fair.  He became sad and withdrawn due to teasing by other children.  They pushed him, slapped and teased him due to his leg.  He and his sister fought and became physically aggressive with one another.  He got frustrated and agitated easily.  He had bad dreams and could not get back to sleep.  Dr. Vemuri diagnosed Ketravion with Axis I - Primary - Dysthymic Disorder (mild chronic depression); Secondary - Enuresis (bed-wetting); Axis IV - problem with primary support group; problem related to social environment; behavioral/personality problems and gave him an Axis V GAF of 41[3] (R. 199).  He started Ketravion on a trial of Prozac, 10 milligrams, and recommended individual therapy.

On December 17, 2003, Dr. Podeszwa found Ketravion to have only 5 degrees of knee flexion (R. 202).  Dr. Podeszwa recommended surgery to increased knee flexion, and Ketravion's parents agreed to consider this option.

On January 21, 2004, Ms. Shaw and Ketravion's father visited Dr. Podeszwa to discuss a surgical plan to address his knee stiffness, which had not responded to physical therapy, and his valgus deformity (R. 201).  The operative procedure was discussed, and it was determined that he would spend 1-2 days in the hospital, followed by up to 6 weeks of casting and this would be followed by another round of physical therapy.  James Mooney, M.D. would be brought on to perform the surgery because Dr. Podeszwa was leaving the practice.

--------

[3] A GAF of 41 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

*Medical Records After the ALJ's May 7, 2004, Decision*[4]

On May 13, 2004, Dr. Moody performed the right quadricepsplasty, medial distal femoral hemi-epiphysiodesis and medial distal tibial hemi-epiphysiodesis (R. 218-219). Ketravion was discharged from the hospital on May 17, 2004, with instructions for toe touch weight bearing with an immobilizer (R. 221).

On July 14, 2004, Ketravion was admitted into a comprehensive inpatient interdisciplinary rehabilitation program with physical therapy, occupational therapy and recreational therapy to work on improving his range of motion in his right knee (R. 226). He was discharged on July 22, 2004, and was expected to be re-admitted after a second surgery (R. 227). At discharge he was able to stretch his right knee 65 degrees with complaints of pain and difficulty, and was ambulating with a standard cane. His discharge instructions included activity as tolerated and no medication.

On August 12, 2004, Dr. Moody performed a second surgery on Ketravion's right knee, a closed manipulation and an open lysis of adhesions and exploration (R. 224).[5]

Ketravion was readmitted to the rehabilitation program (R. 233). Natalia Glisky, M.D., reported that Ketravion was able to ambulate six flights of stairs with a lift until August 26 when Ketravion's right femur was fractured in the hospital during family teaching of home stretching exercises (R. 234). An immobilzer was placed on the leg and Ketravion was scheduled for surgical

---

[4]*Cotton v. Secretary*, 2 F.3d 692 (6th Cir. 1993), holds that evidence submitted to the Appeals Council for the first time cannot be considered under a § 405(g) review on the sufficiency of the evidence, but only as related to whether the evidence is new and material warranting a remand.

[5]There is a discrepancy in the date of this procedure from the dates listed on the form. The date of surgery indicates that it was performed on May 13, 2004, the date of the previous surgery. Yet this is a repair of adhesions formed after this previous surgery, and the date in the upper left-hand corner indicates that the surgery was performed August 12, 2004.

fracture repair and transferred to the orthopaedic department until surgery.

On August 27, 2004, Ketravion underwent surgery to repair his fractured right femur - a closed reduction and application of uniplanar external fixator was performed (R. 236). Some correction of the inherent valgus deformity was also performed. He was discharged on August 31, 2004, with an instruction to remain non-weight bearing until seen again by his doctor (R. 241).

On September 23, 2004, Ketravion was seen again at Easter Seals Southeastern Michigan by Christian McCallister (R. 211-215). In this updated assessment McCallister diagnosed Ketravion with Axis I - adjustment disorder with depressed mood and gave him a GAF of 67 (R. 214).[6]

## 2.    *Ms. Shaw's Testimony*

Ketravion was born on March 29, 1996, and was 7 years old and attending second grade at the time of the hearing (R. 247).

Ms. Shaw first noticed his leg discrepancy when he was three months old. The doctors wanted to wait until he was older to perform surgery to correct the discrepancy (R. 248). Before his surgery Ketravion was "okay" but the surgery changed him emotionally. Since his surgery he no longer wanted to be around other people, and generally spent his time after school standing by himself watching other children play or watching television by himself (R. 266). He was in "turmoil" about attending his physical therapy appointment. He broke down and cried and refused to do what the therapist requested. He explained to his mother that he was "tired of being the way

---

[6] A GAF rating of 67 would indicate some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g. occasional truancy, or theft within household), but generally functioning pretty well, has some meaningful interpersonal relationships.

he was, he just didn't want to go through this anymore.... He said he just didn't want to see his life gone [sic] no more...." (R. 250). His parents started taking him to Easter Seals for counseling because of his behavior and tendency to lash out (R. 268).

Ketravion was taking Tylenol 3 once a week at the time of the hearing (R. 251). His pain was at a level 8 when was doing his therapy (R. 255) and a level four when he was just sitting still (R. 256). He could not bend his knee at all on his own (R. 252-53). He slept with a brace at night to try to increase his flexion in his knee. He also attended physical therapy 2 times a week for 45 minutes each time, which left him feeling tired and wanting to lay down and be left alone (R. 258-59).

When school started in August Ketravion's teacher reported that he would stand by himself but still do his work, but later in the year reported that he started bursting out crying when was unable to "get certain things right" (R. 259). In first grade he felt different because he could not do what all the other kids were doing because he was in the external fixator (R. 259-60). He was in a wheelchair for 3 months, then he used a walker for 3 months and then used a cane, which he sometimes still used when his leg was in pain (R. 261). He could walk around the house without a cane, but his mother stated that he then held on to other objects to relieve pressure on his leg such as the couch or the wall (R. 272).

He could not walk a long distance without tiring out. He took the bus to school each day and walked to his classes (R. 262). He could climb down stairs, but going up was hard because he could not bend his right leg and he dragged it (R. 262-63). He hopped down stairs on his left foot, and tried to hop up stairs by using his left leg and dragging his right (R. 275-76). He could carry his book bag (R. 277). He could carry one bag of groceries if not too heavy, but not two (R. 276-277).

He could not stand longer than 10-15 minutes (R. 264). He slept well at night, though his mother gave him Motrin to aid his sleep (R. 267). His appetite was poor (R. 267). He participated in physical education at school to the extent he could, though he had to sit out recently after a girl accidentally stepped on his leg, and the teacher sometimes had to give him alternative activities (R. 277-78).

### 3.   The ALJ's Decision

ALJ Wilenkin found that Ketravion was not substantially gainfully employed and had the severe impairments of a congenital leg length discrepancy and depression (R. 21). Ketravion's impairments or combination of impairments did not meet or medically equal the severity of any listing in Appendix 1, Subpart P, Regulations No. 4.

Ketravion had no limitations in the following domains: Acquiring and Using Information, Attending and Completing Tasks, Caring for Yourself or Health and Physical Well Being (R. 19). His limitation in the Moving About and Manipulating Objects domain was less than marked (R. 19-20). His limitation in the domain for Interacting and Relating to Others was also less than marked (R. 20). Therefore, Ketravion did not have a medically determinable physical or mental impairment or combination of impairments which resulted in marked or extreme functional limitations, and was not under a disability, as defined in the Social Security Act, at any time through the date of his decision (R. 21).

## II.   Analysis

### A.   Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported

15

by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

There is a three step process in determining whether a child is "disabled" under the definition set forth in the Act. *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). First, the child must not be engaged in substantial gainful activity; second, the child must have a severe impairment; and third, the severe impairment must meet, medically equal or functionally equal one of the impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listing). *See* 20 C.F.R. § 416.924.

Under section 416.926(a), if a child's impairment - or combination of impairments - does not meet or is not medically equivalent in severity to a listed impairment, then the Commissioner will assess all functional limitations caused by the impairment to determine if the child's impairments are functionally equivalent in severity to any of the listed impairments in the Listing.  In assessing whether a child's impairment is functionally equivalent to a listed impairment, the *Elam* Court explained that the following areas of development may be considered: 1) cognition/communication, which is the ability or inability to learn, to understand and to solve problems through reasoning; 2) motor, which includes the ability or inability to use gross and fine motor skills to serve one's physical purposes; 3) social, which includes the ability or inability to form and maintain

16

relationships with other individuals and groups; and 4) concentration, persistence or pace, which is the ability or inability to attend to and sustain concentration on an activity or task. *Elam ex rel. Golay*, 348 F.3d at 126 -127. These areas of development were derived from the six "domains"[7] set forth in 20 C.F.R. § 416.926a:

> (i)   Acquiring and using information;
> (ii)  Attending and completing tasks;
> (iii) Interacting and relating with others;
> (iv)  Moving about and manipulating objects;
> (v)   Caring for yourself; and,
> (vi)  Health and physical well-being.

20 CFR § 416.926a(b)(1).

A child is considered disabled when they show "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 CFR § 416.926a(d).

Marked limitation in a domain occurs when ones "impairment interferes seriously with ability to independently initiate, sustain, or complete activities," and an extreme limitation occurs when an impairments interferes "very seriously," something "more than marked." 20 CFR § 416.926a(e). The Regulations acknowledge that ones "day-to-day functioning may be seriously limited when ... impairment(s) limits only one activity or when the interactive and cumulative effects of ... impairment(s) limit several activities." *Id.*

### B.    Factual Analysis

Ketravion argues that the Commissioner erred in failing to find that (a.) his leg length discrepancy met or medically equalled the severity of a Listing and (b.) his leg length discrepancy and/or depression, or a combination of the two, resulted in two marked functional limitations in

---

[7] Domains are defined as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a.

domains (iv) and (iii) or one extreme functional limitation in domain (v) (Dkt. # 11, p. i.). Plaintiff also argues that a Sentence 6 remand is required for consideration of the medical records submitted to the Appeals Council after the administrative hearing.

### 1. Meeting or Equaling the Listings

The parties agree that whether or not Ketravion meets or equals Listings 101.02 or 101.03 will be decided based upon whether he meets the Regulations' defined medical criterion of dysfunction of a weight bearing joint or reconstruction surgery resulting in the "inability" to ambulate effectively for a 12 month period.

The Regulations indicate how one is to determine whether a child can ambulate effectively for the purposes of determining whether their impairment is disabling as follows:

2. How We Define Loss of Function in These Listings
a. General.
*Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment.* The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. .... We will determine whether a child can ambulate effectively or can perform fine and gross movements effectively based on the medical and other evidence in the case record, generally without developing additional evidence about the child's ability to perform the specific activities listed as examples in 101.00B2b(2) and (3) and 101.00B2c(2) and (3).

b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 101.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.* (Listing 101.05C is an exception to this general definition because the child has the use of only one upper extremity due to amputation of a hand.)

18

....

(3) How we assess inability to ambulate effectively for older children. Older children, who would be expected to be able to walk when compared to other children the same age who do not have impairments, must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out age-appropriate activities. They must have the ability to travel age-appropriately without extraordinary assistance to and from school or a place of employment. *Therefore, examples of ineffective ambulation for older children include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out age-appropriate school activities independently, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.* The ability to walk independently about the child's home or a short distance at school without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 CFR Pt. 404, Subpt. P, App. 1, § 101.00(B)(2)(emphasis added).

ALJ Wilenkin found that Ketravion did not meet the Listing because he "has not had an inability to ambulate effectively but for a brief period of time after the surgery" (R. 17).  As ALJ Wilenkin pointed out, the medical records show Ketravion was able to ambulate without assistive devices by January 2003, seven months after his surgery (R. 19, referring to R. 148).  Ketravion argues that his inability to walk with a normal gait for thirteen months following his surgery, continued need for physical therapy, inability to climb up stairs properly and continued use of a cane were sufficient evidence to support a finding of a listing-level impairment (Dkt. #11, pp.10-11).

As the Regulations state, ineffective ambulation is defined as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities.  Ms. Shaw testified that, following his surgery, Ketravion used a wheelchair for 3 months, a walker for another 3 months and then *a* cane, which he still used at the time of the hearing when his leg was hurting (R. 261).  She also testified

19

that he could carry his own book bag or one bag of groceries (R. 276-77), and that he took the bus to school (R. 262). This testimony, even taken as fully credible, together with the medical records indicating that Ketravion could ambulate without assistive devices as of January 2003, is substantial support for ALJ Wilenkin's finding that Ketravion's leg length impairment did not met or equal any Listing because Ketravion could effectively ambulate as defined by the Regulations within the 12 month period.

The evidence from the record cited by Ketravion for the proposition that there was support for a different finding is not persuasive, both because the evidence is not as strong and because the Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen, supra*, 800 F.2d at 545 (6th Cir. 1986).

### 2.    Functional Limitations

A child is considered disabled pursuant to the Act if that individual "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 1382c(a)(3)(C)(i). After finding that Ketravion did not meet or *medically* equal the Listing, ALJ Wilenkin had to evaluate if Ketravion had one or more impairments that were *functionally* equivalent to the Listing.[8] In order

---

[8]It is somewhat confusing to consider functional equivalence as a separate test in a case such as this where one of the Listing's criteria for medical equivalence is determined by a functional measurement - here the "medical measure" for the degree of severity for listings 101.02 and 101.03 is the functional test of "inability to ambulate effectively" as specifically defined in the Listing. Much of the evidence relevant to this medical equivalence test is also relevant to the functional equivalence test that follows.

to determine whether Ketravion's limitations due to his leg length discrepancy and depression functionally equaled the Listing, ALJ Wilenkin was required to consider how he functioned in the six domains, as described above.  ALJ Wilenkin determined that Ketravion had no limitations in domains 1, 2, 5 or 6 and less than marked limitations in domains 3 and 4.  In his brief Ketravion challenges the findings as to domains 3, 4 and 6.  Therefore, only those domains will be addressed below.

*Domain # 3 - Interacting and Relating to Others*

The Regulations describe interacting and relating for the purposes of this domain as follows:

(i) Interacting means initiating and responding to exchanges with other people, for practical or social purposes. You interact with others by using facial expressions, gestures, actions, or words. You may interact with another person only once, as when asking a stranger for directions, or many times, as when describing your day at school to your parents. You may interact with people one-at-a-time, as when you are listening to another student in the hallway at school, or in groups, as when you are playing with others.

(ii) Relating to other people means forming intimate relationships with family members and with friends who are your age, and sustaining them over time. You may relate to individuals, such as your siblings, parents or best friend, or to groups, such as other children in childcare, your friends in school, teammates in sports activities, or people in your neighborhood.

(iii) Interacting and relating require you to respond appropriately to a variety of emotional and behavioral cues. You must be able to speak intelligibly and fluently so that others can understand you; participate in verbal turntaking and nonverbal exchanges; consider others' feelings and points of view; follow social rules for interaction and conversation; and respond to others appropriately and meaningfully.

(iv) Your activities at home or school or in your community may involve playing, learning, and working cooperatively with other children, one-at-a-time or in groups; joining voluntarily in activities with the other children in your school or community; and responding to persons in authority (e.g., your parent, teacher, bus driver, coach, or employer).

20 CFR § 416.926a(i)(1)

As a school age child Ketravion would be expected to "be able to develop more lasting

21

friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand." 20 CFR § 416.926a(i)(2)(iv).

In determining that Ketravion had "less than marked" limitations interacting and relating to others ALJ Wilenkin relied on the Easter Seals Southeastern Michigan reports (R. 20). Ketravion argues that Dr. Vemuri's December 8, 2003, diagnosis of a GAF of 41, which would indicate a severe impairment in functioning, is sufficient to give him a marked or even extreme limitation in this domain. ALJ Wilenkin felt that this report conflicted with the July 28, 2003, Easter Seals report and its own lack of substantial negative findings (R. 20). In the July 28, 2003 report Ketravion was given a GAF of 55, indicating moderate symptoms, and it was reported that Ketravion liked to do schoolwork, was cooperative and soft spoken, with good concentration and normal perceptions, unremarkable thought process, a broad affect and normal mood, fair judgement, impulse control and insight, no abnormal motor movements and no reports of hallucinations (R. 163-67). Further in Dr. Vemuri's report it is noted that his teachers had reported a increase in attention to school work, and Dr. Vemuri noted that Ketravion had no paranoid ideations, obsessive thoughts, compulsive behaviors, suicidal or homicidal ideations; and had fair judgment, insight and impulse control (R. 198-99). The only negative findings Dr. Vemuri reported were a sad, flat and constricted affect and failure to answer questions. ALJ Wilenkin therefore gave Dr. Vemuri's report only limited weight (R. 20).

The real issue here is whether there is support for a finding that Ketravion is limited in his

ability to interact or relate to others in the ways described by the regulations. A GAF of 41, even if it were fully credible, would not necessarily indicate an inability to relate to others, as one may have an inability to function in a completely different capacity. The only evidence in the record that supports a finding that Ketravion has limitations in relating to others is Ms. Shaw's consistent reporting of Ketravion's withdrawing from his peers due to their teasing and/or his lack of ability to participate in the activities in which they are engaging. And, while the Court sympathizes with this situation, this does not meet the Regulations' definition of an functional limitation in interacting or relating to others, as provided above. Dr. Vemuri's report indicates that Ketravion has no abnormal thought processes, paranoid ideations, obsessive/compulsive behaviors, and he is able to get along with his older brother, mother and father, though he fights with his twin sister (R. 198-99). Ketravion and his mother also reported that he has friends (R. 164). There is no doubt that Ketravion's health issues have effected his mood, as would be expected, though to what extent is argued by the parties. Yet this is not the argument that needs to be made in this domain. This domain measures a child's ability to interact and relate to others and there is support in the record for ALJ Wilenkin's finding that Ketravion's limitation in this domain, while present, is less than marked.

*Domain # 4 - Moving About and Manipulating Objects*

In determining that Ketravion had "less than marked" limitations moving about and manipulating objects ALJ Wilenkin relied on the fact that Ketravion was able to ambulate without assistive devices as of January 2003 (R. 19). He gave only partial credibility to Ms. Shaw's testimony regarding Ketravion's inability to walk more than short distances or stand more than 10-15 minutes due to pain and fatigue, stating that the limitations were not reflected in or supported by

23

the evidence in the record (R. 19-20).

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific.[9] The ALJ must say more than that the testimony on pain is not credible.

Yet, because the ALJ was present during Ms. Shaw's in-person testimony and could evaluate her demeanor, this Court must exercise a degree of deference and limit its role to evaluating whether or not the ALJ's explanations for discrediting her was reasonable and supported by substantial evidence in the record. *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).[10]

ALJ Wilenkin gave lack of supporting evidence as his sole reason for only partially crediting Ms. Shaw's testimony. Yet, while it is true that his opinion should have analyzed Ms. Shaw's credibility in light of the factors set forth in the Regulations relevant to Ketravion's symptoms, his failure to do so should not be cause for reversal here, as more fully explained below.

The Regulations indicate that the following factors are relevant when considering a claimant's symptoms, such as pain

---

[9]When a claimant is a child who cannot "adequately describe h[er] symptoms, the ALJ must accept the testimony of the person most familiar with the child's condition. 20 C.F.R. § 416.928(a). In such a case, the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying." *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001).

[10]Here, because the witness is not the person claiming disability, judicial skepticism over the "sit and squirm" test is not an issue. *Compare Martin v. Secretary of Health and Human Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984) (disallowing dismissal of claim of pain solely on the ALJ's observations of claimant at the hearing) (quoting *Weaver v. Secretary of Health and Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983)).

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 CFR § 416.929.

With regard to these factors, Ms. Shaw testified that she gives Ketravion pain medication, Tylenol 3, only once per week (R. 251). ALJ Wilenkin noted it was given "as needed" (R. 19). The medical records, do not indicate that Ketravion or his parents ever reported to his doctors or physical therapists that he was experiencing pain, fatigue or an inability to walk, stand or climb stairs after his surgery, with the exception of the pain he experienced during physical therapy. ALJ Wilenkin noted that there was no support in the medical reports that Ketravion still needed to use cane as Ms. Shaw testified. There is also no indication that his parents requested or his doctors prescribed any pain medication for him on his follow-up visits. In July 2003, the date the long leg cast was removed, Dr. Podeszwa reported that Ketravion had been active since his last visit and, in fact, "doing more than we would have liked" (R. 169). In July 2003 Ms. Shaw reported to Easter Seals that Ketravion was only taking over-the-counter medication for pain and only before physical therapy (R. 165), and in December 2003 she did not report giving him any pain medication (R. 198). Further, as stated above, Ms. Shaw also testified that Ketravion could carry his own book bag or one bag of groceries (R. 276-77), and that he took the bus to school on his own at the time of the hearing

(R. 262).  Ms. Shaw also testified that Ketravion can walk without his cane when his leg was not

hurting (R. 261) and that he participates, albeit not always fully, in his school physical education

program (R. 277-78).  Therefore, there is support in the record for ALJ Wilenkin's partial credibility

finding.  Further, this same evidence supports that Ketravion is less than markedly limited in this

domain.

This domain measures whether a claimant has limitations in the function of gross and fine

motor skills.  20 C.F.R. 416.926a(j).  As a school-age child, Ketravion would be expected to "move

at an efficient pace about your school, home, and neighborhood.  Your increasing strength and

coordination should expand your ability to enjoy a variety of physical activities, such as running and

jumping, and throwing, kicking, catching and hitting balls in informal play or organized sports. Your

developing fine motor skills should enable you to do things like use many kitchen and household

tools independently, use scissors, and write."  *Id.*

The following are examples of limitations in functioning in this domain:

> (i)  You experience muscle weakness, joint stiffness, or sensory loss
> (e.g., spasticity, hypotonia, neuropathy, or paresthesia) that interferes
> with your motor activities (e.g., you unintentionally drop things).
> (ii)  You have trouble climbing up and down stairs, or have jerky or
> disorganized locomotion or difficulty with your balance.
> (iii)  You have difficulty coordinating gross motor movements (e.g.,
> bending, kneeling, crawling, running, jumping rope, or riding a bike).
> (iv)  You have difficulty with sequencing hand or finger movements.
> (v)  You have difficulty with fine motor movement (e.g., gripping or
> grasping objects).
> (vi)  You have poor eye-hand coordination when using a pencil or
> scissors.

*Id.*

There is no dispute that Ketravion has limitation in his gross movement due to the

immobility of his right knee.  Yet there is substantial support in the case record for ALJ Wilenkin's

26

finding that Ketravion's limitation is less than marked, and, as stated above, his failure to fully justify his reasons for finding Ms. Shaw's testimony only partially credible should be considered harmless error because the record also supports this decision.

*Domain #6 - Health and Physical Well-Being*

In determining that Ketravion's had no limitations in the domain of health and physical well-being, he indicated that all symptoms that would have been considered in this domain had already been considered in domain 4 (R. 20). Ketravion takes issue with this ruling arguing that the fatigue he felt after his physical therapy as well as the fact that his leg had to be immobilized for 13 months and required a second surgery should have been analyzed under this domain (Dkt. # 11, p. 15).

This domain measures the cumulative physical effects of ones impairment and the associated treatment, and is meant to consider those effects *not* considered in the "moving about and manipulating objects" domain. 20 C.F.R § 416.926a(l). Some examples of the kind of limitations contemplated by the Act as limitations in this domain are as follows: generalized weakness, dizziness, agitation/excitability, lethargy, psychomotor retardation, somatic complaints, etc. *Id.*

While the full extent of the right leg immobilization should have been taken into account in domain 4 and need not be reconsidered in this domain, Ketravion's other complaints should have been considered here. This is the proper domain in which to consider Ketravion's bed-wetting, night mares, depression, fatigue following physical therapy and possible loss of appetite. Yet ALJ Wilenkin's failure to do so is harmless error unless an extreme limitation in functioning could be found from these symptoms, because even a marked limitation in only one domain would not, by itself, be enough to overturn the ALJ's previous ruling and none of the other domains have produced even a marked limitation.

27

There is sufficient evidence in the record to support ALJ Wilenkin's finding that the December 2003 Easter Seals report is only entitled to limited weight. As described above, there were only limited negative findings in the report while the prescribed GAF of 41 indicated a serious impairment. Therefore, there being no other evidence in the record to support an extreme limitation in functioning brought on by the aforementioned symptoms, it should be considered harmless error for ALJ Wilenkin to have failed to consider the evidence in this domain.

In sum, ALJ Wilenkin met his burden for finding that Ketravion was not disabled. It is not sufficient that there is evidence in the record to support a contrary decision. *Gooch v. Sec. of Health & Human Services*, 833 F.2d 589, 592 (6th Cir.1987) , *Mullen, supra*, 800 F.2d at 545. This Court must determine whether the ALJ's decision is supported by "[m]ore than a mere scintilla" of evidence . *Richardson, supra*, 402 U.S. at 401. Because his decision is so supported, the ALJ's determination must be upheld.

### 3.    Appeals Council Evidence

Ketravion's counsel also argued for a remand for consideration of the medical records submitted after the ALJ's decision (Dkt. #11, p. 16).

As noted above, evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review. *Cline v. Comm'r of Social Sec.,* 96 F.3d 146, 148 (6th Cir.1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."). "The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and

that there was good cause for not presenting it in the prior proceeding." *Id.*

For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990).  Such evidence is "material" only if there is a reasonable possibility that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.  *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981).[11]  A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.  *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam). The burden of showing that a remand is appropriate is on the claimant.  *Oliver v. Sec'y of Health & Human Servs.,* 804 F.2d 964, 966 (6th Cir.1986).

---

[11]Defendant quotes *Sizemore v. Sec'y Health & Human Servs.*, 865 F.2d 709 (6th Cir. 1988) for the proposition that Plaintiff must show that there is a reasonable *probability* that the Secretary would reach a different result with the new evidence, as opposed to a reasonable *possibility*.

In *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988), the Sixth Circuit discusses the materiality standard of § 405(g) and determines that claimants must "demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence" in order to meet the materiality burden.  865 F.2d at 711(citations omitted).  Yet, it is clear from reading *Sizemore* that the issue of the definition of "materiality" was not before the Sixth Circuit in that case.  It also appears that the Sixth Circuit in *Sizemore* misstates the actual law in this and other circuits.  None of the cases that it cites support the proposition that the materiality standard requires that there must be a "reasonable probability" of a different outcome.  The case law focusing on this specific issue makes it clear that a lower standard of "reasonable possibility," and not "reasonable probability" applies for considering the materiality standard under 42 U.S.C. § 405(g).  *See Chaney, supra*, 659 F.2d 676, 679 ("Thus we hold that a remand to the Secretary is not justified if there is no reasonable possibility that it would have changed the outcome of the Secretary's determination."); *Godsey v. Bowen*, 832 F.2d 443, 444 (7th Cir. 1987); *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987); *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987); *Booz v. Secretary*, 734 F.2d 1378, 1380-81 (9th Cir. 1984); *Dorsey v. Heckler*, 702 F.2d 597 (5th Cir. 1983).

The new evidence shows that Ketravion underwent surgery to increase the right knee flexion on May 13, 2004 (R. 218-219). The surgery required a four day hospital stay and he was discharged with an immobilizer on his knee with instructions for toe touch weight bearing (R. 221). He was admitted to an 8 day in-patient rehabilitation program in July 2004 to increase flexion following this surgery (R. 226-227). Upon discharge he was ambulating with a cane and was instructed to complete activities as tolerated and was not given any medication. On August 12, 2004, another surgery was performed to remove adhesions that had formed after the last surgery (R. 224). Ketravion was then readmitted to the rehabilitation program for another 6 weeks (R. 233). During the course of his treatment his right femur was broken and had to surgically repaired on August 27, 2004 (R. 236). He was discharged from the hospital on August 31, 2004, with instructions to remain non-weight bearing until seen again by his doctor (R. 241). Ketravion was also seen again by Easter Seals Southeastern Michigan on September 23, 2004, and was diagnosed with adjustment disorder with depressed mood and a GAF of 67 (R. 214), indicating some mild symptoms or some difficulty in functioning but generally functioning pretty well.

Since the procedures at issue took place after the administrative hearing the evidence is clearly new and there is good cause for not having presented it at the administrative hearing. Whether the evidence is material hinges upon whether its existence would have changed the Commissioner's decision had it been available during the review process.

Even with these additional surgical procedures, apart from a short recovery period, Ketravion remained able to walk with the aid of a single cane (R. 227, 233). The new evidence does not indicate that Ketravion's ability to move about or manipulate objects was limited by any of the surgeries for a sufficient time to meet the durational requirements for a disability finding. Further,

the new Easter Seals Southeastern Michigan report with the improved GAF lends further support to ALJ Wilenkin's previous conclusion that Ketravion has only a mild to moderate limitation in functioning regarding interpersonal relations and depression.  Therefore there is no reasonable possibility this new evidence would alter the findings in Domain 3 or 4.  Ketravion's counsel argues that even if this is true the new evidence should be considered under Domain 6 because it relates to the cumulative effects of treatment (Dkt. # 17, p. 4).

The Regulations indicate that

> For the sixth domain of functioning, "Health and physical well-being," we may also consider you to have a "marked" limitation if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, "frequent means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that you have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

20 CFR § 416.926a(e)(2)(iv).

The exacerbations to Ketravion's leg impairment have caused him at least 3 in-patient hospital stays in 2004, with extensive rehabilitation and 3 surgeries.  This evidence is most relevant under Domain 4, not Domain 6; and, as stated above, Domain 6 is meant to consider those effects *not* considered in Domain 4.  20 C.F.R § 416.926a(l).

Further, even if this matter were remanded for consideration of the new evidence only a

31

finding of extreme limitation could reverse the previous ruling, as a marked limitation in only one domain is insufficient for a finding of disability.  When a child has an extreme limitation under Domain 6 they "generally have an impairment(s) that 'meets' or 'medically equals' a listing".  20 C.F.R. § 416. 926a(e)(3)(iv).  Because there is not a reasonable probability that the additional evidence could support a finding that Ketravion was extremely limited in Domain 6, there is not a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with this new evidence, the evidence is therefore not material, and a remand should not be granted.

## III.    RECOMMENDATION

For the reasons stated above, it is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: January 25, 2006                    s/Steven D. Pepe_____
Ann Arbor, Michigan                        United States Magistrate Judge


Certificate of Service

I hereby certify that copies of this Report and Recommendation were served upon the attorneys of record by electronic means or U. S. Mail on January 25, 2006.

                                    s/William J. Barkholz___
                                    Courtroom Deputy Clerk