UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA SHAW on behalf of
KETRAVION EDWARDS, a minor,

    Plaintiffs,

v.                                                       Case No. 05-70087

JO ANNE BARNHART,                  HONORABLE AVERN COHN
COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

_____/

**MEMORANDUM AND ORDER ACCEPTING IN PART AND REJECTING IN PART
REPORT AND RECOMMENDATION
DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT AND REMANDING THE
CASE BACK TO THE ALJ**

**I. Introduction.**

      This is a social security case. Plaintiff Patricia Shaw (Shaw), on behalf of plaintiff Ketravion Edwards (Edwards), Shaw's minor son, appeals from the final determination of the Commissioner of Social Security (Commissioner) that Edwards was not disabled. An Administrative Law Judge (ALJ), after a hearing, determined that Edwards was not entitled to Supplemental Security Income (SSI) benefits. The Social Security Administration's Appeals Council denied review of the ALJ's decision.

      Plaintiffs filed this action for judicial review under 42 U.S.C. § 405(g). Plaintiffs and the Commissioner filed motions for summary judgment. They were referred to a magistrate judge to consider. The magistrate judge issued a report and recommendation (MJRR) that the ALJ's decision be affirmed because it was supported

by substantial evidence and any oversights by the ALJ were harmless error. Plaintiffs disagree and request that the Court reverse the ALJ's decision and award benefits to Edwards, or, alternatively, remand the case for reconsideration of the ALJ's decision because of the ALJ's errors of law and in light of new evidence not previously before the ALJ.

For the reasons that follow, the case will be remanded to the ALJ for further proceedings.

## II. Background.[1]

### A. Edwards' Medical History.

Edwards was born in March, 1996, with a congenitally shorter right leg compared with his left leg, and with only four toes on his right foot.[2] Doctors monitored Edwards' leg regularly to determine the need for surgical or other measures to lengthen the leg and ensure proper flexibility. When Edwards was about one year old he was fitted with a brace. In late 1997, a two centimeter limb length inequality was measured. Eventually Edwards was fitted with a shoe lift.

In February, 1999, a clinical exam by Doctor Kathryn Cramer (Cramer) showed Edwards' right leg was three and half centimeters shorter than his left, and an x-ray

---

[1] The background is gleaned from the parties' papers. The MJRR accurately sets forth the facts, some of which are repeated here.

The parties followed the Court's summary judgment motion practice guidelines but for the following exception: the Plaintiff did not highlight the relevant portions of exhibits. For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/Cohn/motion.htm.

[2] Edwards has a twin sister.

showed a two centimeter discrepancy. Edwards was given a new shoe lift and brace, as he had outgrown the others. Cramer continued to monitor Edwards' condition.

By April, 2001, Shaw reported to Cramer that Edwards ran and played normally. Edwards' brace had been destroyed, and Cramer discontinued prescribing its use. Cramer observed some functional restrictions in Edwards' leg, and prescribed physical therapy and a larger shoe lift. Edwards did not go to physical therapy, but did get the new shoe lift. In September, 2001, Cramer discontinued the unused physical therapy prescription.

### B. Edwards Undergoes Leg Lengthening Surgery.

In April, 2002, Cramer and Shaw discussed limb lengthening surgery for Edwards. Shaw opted for the surgery, though Edwards had been able to walk with the shoe lift. Edwards began surgery preparation, which included physical therapy and a cast. Edwards underwent in-patient surgery in June, 2002, and spent eight days in the hospital undergoing post-operative therapy. The surgery involved applying an external frame and pins, which slowly permitted the bone to stretch and regenerate.

After surgery, Edwards used a wheel chair and then a walker. Cramer examined Edwards weekly over the next month, and then saw him monthly. Edwards gradually improved, but experienced some pain and considerable post-surgical anxiety around tasks required for recovery. Edwards was ordered to perform physical therapy two to three times per week for six to eight months. Eventually, Edwards graduated from using a walker to using a cane.

In November, 2002, Doctor Sharda Sood, a Social Security Administration pediatrician, indicated that Edwards' physical impairment was "of listing level severity,"

meaning he qualified for SSI, but the condition was not expected to continue at that level for 12 months as was required because the lengthening process was not expected to last that long.

In January, 2003, Doctor David Podeszwa (Podeszwa) began treating Edwards. Podeszwa observed that Edwards was doing well with physical therapy and gait. Edwards complained of occasional pain, which was treated with rest and Motrin, but was otherwise active. His pin sites were "pristine," his ankle dorsiflexion was 10-15 degrees, and he ambulated bearing full weight without assistive devices but with a noticeable limp. Podeszwa recommended continued physical therapy and weight bearing.

In April, 2003, Edwards' leg showed no change. Based on Podeszwa's recommendation, the external frame was removed and Edwards' leg was placed in a long leg cast to aid bone healing. During a followup visit, Podeszwa changed the cast after noticing it was soaked with urine from bed-wetting, evidence of continued post-surgical psychological anxiety Edwards felt. Otherwise, Edwards reported no difficulties and was able to walk with the cast; the leg showed a small improvement.

Edwards' bone improved and the cast was removed in July, 2003. Podeszwa noted that Edwards had been ambulating full weight bearing, probably more than he would have liked, but had no range of motion in his knee. Podeszwa prescribed physical therapy, but was not confident this would restore the knee and thought additional surgery may be needed.

Edwards attended physical therapy two to three times a week for 12 weeks. Edwards mostly tolerated the treatment well, experienced little pain, and was gaining

range of motion in his knee through stretches.

### C. Edwards' Treatment Continued.

Shaw was concerned about her son's psychological and emotional health after the surgery. Edwards had a mental health intake assessment at Easter Seals in July, 2003, performed by Christian McCallister. McCallister also interviewed Shaw, who indicated that Edwards had some trouble talking to people and spoke about not being able to make it after his surgery because he did not like physical therapy. Shaw said he had nightmares, cried when he went to the hospital, argued with his sister, and had a decreased appetite. Edwards said he had friends but was teased at school. McCallister observed that he was soft-spoken with a fair memory and normal perceptions and unremarkable thought process, normal mood, fair judgment, fair impulse control and fair insight. McCallister diagnosed Edwards with Axis I - Primary - "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct;" Axis I - Secondary - Posttraumatic Stress Disorder; Axis I - Tertiary - Enuresis; Axis IV - problem with primary support group, problem related to social environment, other psychological and environmental problems and behavioral/personality issues. McCallister rated Edwards's Axis V Global Assessment of Functioning (GAF) at 55, indicating moderate symptoms. McCallister recommended individual and family therapy.

Edwards continued physical therapy and the range of motion in his knee fluctuated between 10 degree and 50 degrees during August, September and October, 2003.

In December, 2003, Edwards had another psychiatric assessment at Easter

Seals, this time performed by Lalitha Vemuri (Vemuri).  Shaw reported that Edwards was happy before the surgery, but had since become moody, depressed and withdrawn from his peers and teachers.  Shaw talked about Edwards' nightmares and inability to get back to sleep.  During this visit, Shaw emphasized the teasing, pushing and slapping Edwards endured from other kids because of his leg, causing him to be more frustrated and agitated.  Vemuri diagnosed Edwards with Axis I - Primary - Dysthymic Disorder (mild chronic depression); Secondary - Enuresis (bed-wetting); Axis IV - problem with primary support group.  Vemuri rated Edwards' GAF at 41, indicating serious psychological symptoms or a serious impairment in social, occupational or school functioning

### D.  Shaw's Testimony.

Shaw testified about discovering Edwards' leg discrepancy and about how leg surgery changed him emotionally.  After the surgery, Shaw testified, Edwards no longer wanted to be around other people and, after school, either watched children play or watched television by himself.  Shaw explained that Edwards cried about attending physical therapy and did not want to go through it anymore, thus prompting her to take him to counseling.

Shaw described Edwards' weekly routine and how she helped him manage the pain in his leg.  Shaw testified that Edwards got frustrated at school sometimes because kids teased him and the brace prevented him from doing what the other kids did.  After the April, 2002, surgery, Shaw said Edwards used a wheel chair for three months, a walker for three months, and then a cane, which he still used on occasion to relieve the pressure on his leg.  Shaw testified that Edwards took the bus to school and could carry

a book bag while walking to class, but got tired after walking long distances and generally had to hop up and down stairs on his left leg.  Shaw testified that Edwards is scared to hurt his leg and thinks other kids will tease him.

The record was left open after the hearing for the submission of additional evidence.

### E.  The ALJ's Opinion.

On May 7, 2004, the ALJ denied Edwards' claim for benefits.  After considering the medical evidence and testimony, the ALJ found that though Edwards had not engaged in substantial gainful activity at any time since the date of alleged onset of disability, his alleged impairments of congenital leg length discrepancy and depression did not meet or medically equal the severity of any listing in the SSI regulations, and his impairments did not result in "marked" or "extreme" functional limitations.  As such, the ALJ found that Edwards had not been disabled at any time.

Edwards appealed the decision to the Appeals Council, which denied review.

### E.  Subsequent Medical Evidence.

Podeszwa and Shaw discussed surgical options to increase Edwards' knee flexion.  Doctor James Mooney (Mooney) performed the surgery in May, 2004, after the ALJ rendered a decision.  In July, 2004, Edwards entered inpatient rehabilitation for nine days to improve the range of motion in his knee.   At discharge Edwards could stretch his knee 65 degrees with some pain and difficulty, but he was walking with a standard cane.  In August, 2004, Moody performed a second surgery, after which Edwards was readmitted to the rehabilitation program.  While in the program, Edwards right femur broke during stretching exercises.  Edwards underwent surgery to repair his

fractured femur and was discharged with instruction to remain non-weight bearing until seen by his doctor.

In September, 2004, McCallister interviewed Edwards again at Easter Seals. McCallister diagnosed Edwards with Axis I - adjustment disorder with depressed mood, and a GAF of 67, indicating some mild depression or social difficulty. This GAF suggests that generally Edwards was functioning pretty well.

### III. Discussion.

### A. Standard of Review.

Judicial review of a Social Security disability benefits application is limited to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997). A reviewing court may not resolve conflicts in the evidence or decide questions of credibility. Brainard v. Sec'y of Health & Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The substantiality of the evidence must be based upon the record taken as a whole. Futernick v. Richardson, 484 F.2d 647, 649 (6th Cir. 1973). "[T]he decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts."

Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). The portions of the MJRR that the claimant finds objectionable are reviewed de novo. See 28 U.S.C. § 636(b)(1)(C); Smith v. Detroit Fed'n of Teachers, Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

### B. Analysis.

### 1. Introduction.

There is a three step process for determining whether a child is "disabled" under the definition set forth in the social security regulations, 20 C.F.R. § 416.924. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). First, the child must not be engaged in substantial gainful activity; second, the child must have a severe impairment; and third, the severe impairment must (a) meet, (b) medically equal, or (c) functionally equal, one of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listing). There is no dispute that Edwards meets the first and second prongs of the test. The question is whether substantial evidence supports the ALJ's finding that Edwards did not meet the third prong in any of the three possible ways.

The MJRR concluded that substantial evidence supports the ALJ's determination that Edwards was not disabled. Edwards objects to the MJRR, saying judgment should be entered in his favor, or that his case must be remanded to the ALJ to consider medical records from after the ALJ's decision because such evidence only can be considered by this Court to determine whether the evidence is new and material warranting remand. Cotton v. Sec. of Health & Hum. Servs., 2 F.3d 692 (6th Cir. 1993).

### 2. Substantial Evidence Supports the ALJ's Decision that Edwards' Condition Did Not Meet or Medically Equal a Listed Impairment.

### a. Legal Standard.

Edwards argues that the ALJ erred in finding his physical impairment did not meet or medically equal a Listing. Two Listings are at issue:

<u>Listing 101.02</u>: addresses any major dysfunction of a joint characterized by gross anatomical deformity with chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, resulting in inability to ambulate effectively, as defined in 101.00(B)(2)(b);

and

<u>Listing 101.03</u>: addresses the situation where reconstructive surgery off a major weight-bearing joint results in an inability to ambulate effectively, as defined in 101.00(B)(2)(b), and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

In both cases, the determinative question is whether Edwards is able to "ambulate effectively" under the regulations. Section 101.00(B)(2) outlines how the ALJ was to determine whether Edwards could "ambulate effectively:"

a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone. When there is an inability to perform these activities due to a mental impairment, the criteria in 112.00ff are to be used. We will determine whether a child can ambulate effectively or can perform fine and gross movements effectively based on the medical and other evidence in the case record, generally without developing additional evidence about the child's ability to perform the specific activities listed as examples in 101.00B2b(2) and (3) and 101.00B2c(2) and (3).

b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. Ineffective

10

ambulation is defined generally as having insufficient lower extremity functioning (see 101.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 101.05C is an exception to this general definition because the child has the use of only one upper extremity due to amputation of a hand.)

....

(3) How we assess inability to ambulate effectively for older children. Older children, who would be expected to be able to walk when compared to other children the same age who do not have impairments, must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out age-appropriate activities. They must have the ability to travel age-appropriately without extraordinary assistance to and from school or a place of employment. Therefore, examples of ineffective ambulation for older children include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out age-appropriate school activities independently, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about the child's home or a short distance at school without the use of assistive devices does not, in and of itself, constitute effective ambulation.

### b.  Resolution.

The ALJ found that Edwards did not meet either Listing because his inability to ambulate effectively was limited to a brief period of time after the surgery. In objecting to the MJRR, Edwards cites considerable evidence from the record showing that he could not ambulate *normally*, due to a leg brace, a cast, slow healing, or pain. However, under the regulations, the ALJ only determined whether Edwards could ambulate *effectively*. Ineffective ambulation is defined as being unable to ambulate without the use of hand-held assistive devices that limits the functioning of both upper extremities. Shaw testified that Edwards used a wheelchair for three months, a walker for three months, and then one cane, which he still used when his leg was hurting. Even if Edwards had to use a cane at all times, which he did not, he would be able to

11

ambulate effectively under the regulations

Edwards no doubt ambulates awkwardly and with some pain and difficulty.  But he did not meet or medically equal either Listing.  The record reflects that Edwards was able to carry his book bag to the school bus, navigate the stairs at school with some difficulty, and occasionally used a cane to walk when he experienced pain.  The medical records reflect a fluctuating degree of knee flexibility, walking ability, and endurance by Edwards since first undergoing surgery in April, 2002.  The regulations require an "inability" to use public transportation, use stairs, walk at a reasonable pace, and perform age-appropriate activities to be disabled.  The evidence suggests that Edwards did these things, therefore, substantial evidence supports the ALJ's decision.

### 3.  Whether Edwards' Condition Functionally Equals a Listed Impairment.

#### a.  Legal Standard.

If a child's impairment(s) do not meet or medically equal a Listing, the Commissioner must assess the child's functional limitations to determine whether the impairments are functionally equivalent in severity to any of the impairments in the Listing.  20 C.F.R. § 416.926a(a).  A child is considered disabled when he or she showed "marked" limitations in two or an "extreme" limitation in one of the following domains:

      (1) Acquiring and using information;
      (2) Attending and completing tasks;
      (3) Interacting and relating with others;
      (4) Moving about and manipulating objects;
      (5) Caring for yourself; and,
      (6) Health and physical well-being.

20 C.F.R. §§ 416.926a(b)(1) and 416.926a(d).

"Marked" limitation in a domain occurs when one's "impairment interferes seriously with ability to independently initiate, sustain, or complete activities; an "extreme" limitation occurs when impairments interfere "very seriously," something more than "marked." 20 C.F.R. § 416.926a(e).  Unlike above, Edwards' psychological and emotional condition is an impairment relevant to this analysis

There is no dispute that Edwards had no limitations in domains 1, 2, and 5.  The ALJ found less than "marked" limitations in domains 3 and 4, and no limitation in domain 6.  Edwards challenges the ALJ's findings as to domains 3, 4, and 6, thus the Court's review will be limited to these three domains.

### b. Domain #3: Interacting and Relating to Others.

The regulations describe "interacting and relating to others" for the purposes of this domain as follows:

(i)   Interacting means initiating and responding to exchanges with other people....
(ii)  Relating to other people means forming intimate relationships with family members and with friends who are your age, and sustaining them over time....
(iii) Interacting and relating require you to respond appropriately to a variety of emotional and behavioral cues....

20 C.F.R. § 416.926a(i)(1).

The ALJ's conclusion was based on the psychological reports generated during Edwards' visits to Easter Seals.  The Easter Seals diagnoses before the ALJ's decision included a GAF of 41, indicating severe impairment in functioning, and a GAF of 55, indicating moderate symptoms.  Edwards objects to the ALJ's sole reliance on these reports in lieu of relying on Shaw's testimony regarding Edwards' emotion turmoil regarding therapy, the teasing he endured at school, and how he did not interact with

other children.  Edwards also objects to the lack of testimony from a psychiatrist contradicting the GAF of 41, and says the ALJ's decision to reject the GAF amounted to relying on his own lay interpretation of the medical report, thus "playing doctor."

There appears to be conflicting evidence in the record.  The Easter Seals reports, the medical records, and Shaw's testimony all include evidence supporting Edwards' position, but also support the ALJ's finding of less than "marked" limitation.  Specifically, the GAF of 55 reported by McCallister supports the ALJ's conclusion and contradicts the GAF of 41.  Conflicts are for the fact-finder to resolve, which it did against Edwards.  Despite the conflict, there is substantial evidence supporting the ALJ's decision as to this domain.  Because, however, remand is required for other reasons, the ALJ shall reexamine this domain with the additional evidence

### c. Domain #4: Moving About and Manipulating Objects.

This domain measures whether a claimant has limitations in the function of gross and fine motor skills.  20 C.F.R. § 416.926a(j).  It measures a claimant's strength, coordination, ability to enjoy a variety of physical activities, and ability to use many kitchen and household tools.

In concluding that Edwards had less than "marked" limitations in domain #4, the ALJ relied on the fact that Edwards was able to ambulate without assistive devices at all as of January, 2003, and gave only partial credibility to Shaw's testimony regarding his inability to walk more than short distances or stand more than 10-15 minutes due to pain and fatigue.  The ALJ stated that Shaw's testimony was not supported by the record, thus found it only partially credible, but gave no more specific explanation as to why.

Edwards did not testify because when a claimant is a child who cannot "adequately describe [his] symptoms, the ALJ must accept the testimony of the person most familiar with the child's condition." 20 C.F.R. § 416.928(a). If the ALJ rejects a claim of pain, it must do so with specificity, and cannot be general and conclusory. SSR 96-7p. The ALJ's decision is still reviewed for substantial evidence.

The MJRR concluded that "while it is true that the [the ALJ's] opinion should have analyzed Ms. Shaw's credibility in light of the factors set forth in the Regulations relevant to [Edwards'] symptoms, his failure to do so" was harmless error. MJRR at 24, 27. The MJRR recognized that Edwards had limitations in movement due to the immobility of his right knee, but concluded that substantial evidence supported the ALJ's finding that the limitation was less than "marked", and his failure to fully justify his reasons did not change the result.

Edwards objects to the ALJ's lack of analysis and says it is error for the MJRR to perform the ALJ's role. Edwards says his right knee lacked any usable motion, indicating a condition more severe than the ALJ concluded. Specifically, Edwards notes the ALJ's false conclusion that he was walking with no assistive device in 2003. Edwards says the surgery required at about the time of the ALJ's decision indicates that physical therapy did not last, thus contradicting the ALJ's conclusion, and that the case should be remanded for the ALJ to perform a proper assessment of Shaw's credibility.

The ALJ heard Shaw's testimony and the Court must give some deference to his credibility determination. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). Even taking Shaw's testimony as completely credible, Edwards motor skills fluctuated significantly over time. Edwards took Tylenol 3 only once per week, and

15

Shaw testified that he could carry his own book bag on the bus to school, walk without a cane at times, and partially participate in his school physical education program. It might be that substantial evidence supports the ALJ's conclusion. The ALJ's error of law, however, cannot be considered harmless, and more recent evidence might alter the ALJ's decision, thus the case must be remanded to the ALJ for the reasons stated in Part 4 below.

### d. Domain #6: Health and Physical Well-Being.

The ALJ concluded that all symptoms to be considered in this domain had already been considered in domain #4. The MJRR recognized that this domain measures the cumulative physical effects of one's impairment, and is meant to consider those effects not considered in domain #4. 20 C.F.R. § 416.926a(1). The MJRR concluded that Edwards' bed-wetting, nightmares, depression, fatigue following therapy and possible loss of appetite should be considered here, but that the ALJ's failure to do so was harmless error because even a "marked" limitation in domain #6 would not be enough to overturn the ALJ's previous ruling, as no other domain had produced a "marked" limitation and an "extreme" limitation was not unlikely. In assessing these other factors, the MJRR stated that sufficient evidence supported the ALJ's decision to give the GAF of 41 in the Easter Seals report only limited weight, and there was no other evidence supporting an "extreme" limitation, thus it was harmless error for the ALJ to have failed to consider the evidence in this domain.

Edwards objects to the MJRR's assertion that no other evidence supports the GAF of 41, citing Shaw's testimony, the urine-soaked cast, and other medical evidence, and says the failure of the ALJ to consider this evidence is not harmless error if domain

16

#4 is re-examined properly by the ALJ and deemed a "marked" limitation.  Edwards says remand to the ALJ, not de novo review by the magistrate judge, is required when such an error occurs.  Foster v. Halter, 279 F.3d 348, 353 (6th Cir. 2001).

The Court cannot correct the ALJ's error and the case must be remanded to the ALJ for the reasons stated in Part 4.

### 4. Remand is Required to Consider Additional Medical Records.

Finally, Edwards asks the Court to remand his case to consider medical records submitted after the AJL's decision.  "The district court can...remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding."  Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996).  Evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding."  Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990).  Evidence is material if there is a reasonable possibility that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence.  Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981).  "Good cause" is shown by demonstrating a reasonable justification for the failure to acquire and present the evidence to the ALJ.  Willis v. Sec'y of Health and Human Servs., 727 F.2d 551, 554 (1984).

The MJRR concluded that the medical records are new and that Edwards had good cause for not presenting the evidence to the ALJ.  But the MJRR recommended that the medical records are not material because: Edwards remained able to walk with the aid of a single cane thus not implicating a Listing or domain #4; the new GAF of 67,

reflected an increase in functioning supporting the ALJ's conclusion for domain #3; and that none of the records implicate domain #6. Edwards objects to the MJRR's categorical rejection of the records under domain #6, saying some apply, and to the impact of the evidence on domain #4 because the ALJ did not believe he needed a cane at all. Edwards said the ALJ's incorrect belief that he could walk without a cane, and the fact that his June, 2002, surgery continued to require therapy and surgery throughout 2004 falls under domain #6, thus the records create the reasonable possibility of a different result if remanded to the ALJ.

Edwards says, essentially, that the additional medical evidence must be "material" because it could support a "marked" limitation in domains #4 and #6, the two areas where the MJRR found that the ALJ had committed error.[3] The MJRR found the ALJ's error to be harmless in both domains. But the MJRR's finding of harmless error in part relied on the fact that Edwards needed to establish a "marked" limitation in two domains, and there were no"marked" limitations in another domain.

The MJRR attempted to correct the ALJ's error. But it is not up to the Court or the magistrate judge to perform the analysis missing from the ALJ's decision. Harmless error might exist had the ALJ erred in the consideration of only one domain, rather than two. Add to these errors evidence that Edwards' condition has required two additional surgeries and considerable physical therapy since the ALJ's decision, and the Court cannot simply decide that substantial evidence supports the ALJ's decision. The Court

---

[3] Edwards says the ALJ erred in considering domain #3 as well, but the Court finds substantial evidence to support this part of the ALJ's decision, and the additional medical records include a GAF of 67, further supporting the ALJ's conclusion as to domain #3.

instead must give the ALJ the opportunity to correct previous errors and consider the additional medical records.

### C.  Conclusion.

Errors of law made by the ALJ, coupled with new and material evidence supporting Edwards disability claim, require that the Court remand the case to the ALJ to consider whether Edwards' impairment functionally equals a Listing.  While the Court found substantial evidence supporting the ALJ's decision that Edwards' impairment did not meet or medically equal a Listing, and there was not a "marked" limitation under domain #3 for whether the impairment functionally equal a Listing, the ALJ may find it prudent to reconsider these factors in light of the medical evidence over the 22 months since it rendered its initial opinion.  The case is REMANDED to the ALJ for further proceedings consistent with this decision.

SO ORDERED.


Dated:  March 17, 2006               s/Avern Cohn
                                     AVERN COHN
                                     UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 17, 2006, by electronic and/or ordinary mail.

                                      s/Julie Owens
                                     Case Manager, (313) 234-5160